# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **PAMELA D. GILBERT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | Civil Action Number |
| **vs.** | ) | **3:18-cv-01007-AKK** |
| | ) | |
| **ALABAMA DEPARTMENT OF** | ) | |
| **HUMAN RESOURCES**, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Pamela D. Gilbert, proceeding pro se, asserts claims against her former employer, the Alabama Department of Human Resources ("DHR"), for purported violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* Allegedly, DHR (1) discriminated against her on the basis of race, color, and age by inflating her workload in comparison to Caucasian supervisors, denying her training and FMLA leave, and discharging her; (2) subjected her to a hostile work environment (Title VII only, *see* doc. 14); and (3) retaliated against her after she complained of the alleged hostile work environment. DHR moves for summary judgment, arguing that Gilbert cannot show that its proffered reasons for discharging her are pretextual or establish a prima facie case of retaliation or hostile work environment. Docs. 31 and 33. For the reasons discussed below,

DHR's motion is due to be granted as to the discriminatory discharge, retaliation, and hostile work environment claims. But, because DHR failed to address Gilbert's disparate treatment claims, the motion is due to be denied as to her Title VII claim that DHR discriminated against her by inflating her workload in comparison to her Caucasian peers.

## I.  STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears the initial burden of informing the court of the basis of the motion and proving the absence of a genuine dispute of material fact. *Id.* at 323. If the moving party meets that burden, the burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324 (internal citations and quotation marks omitted). A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-movant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL BACKGROUND[1]

Gilbert, an African-American woman over the age of forty, worked for DHR from 1996 until her discharge in 2017. Docs. 34-1 at 10; 37 at 37. DHR hired Gilbert initially as a case worker and promoted her to a supervisor position twelve years later. Docs. 34-1 at 10; 37 at 37. At times relevant to this action, Gilbert

---

[1] The facts recited are those the parties supported with citation to evidence, or that are contained in Gilbert's affidavit, and the facts are presented in the light most favorable to Gilbert. Although the court informed Gilbert that she cannot rely on allegations in her complaint to oppose summary judgment and must cite to particular parts of the record to show that a fact is genuinely disputed, doc. 36, Gilbert did not provide citations for most of the allegedly undisputed or disputed facts in her opposition brief, *see* doc. 37. These alleged contentions are, therefore, not properly before the court.

supervised the adult protective services ("APS") unit in Lauderdale County. Docs. 34-1 at 10-12; 34-13 at 1. When DHR restructured assignments in October 2015, it transferred Gilbert to a position as the quality assurance ("QA") Coordinator (also described as supervisor of the QA unit) and resources unit supervisor. Docs. 34-1 at 10-13; 34-13 at 1. As the resources unit supervisor, Gilbert supervised two case workers and an aide who licensed and monitored foster homes. Docs. 34-1 at 10-12; 34-11 at 1; 34-13 at 1. As QA Coordinator, Gilbert coordinated case workers from randomly selected Child Protective Services cases with QA team members from the community who reviewed DHR's work on the cases, and she prepared a biannual report of those reviews, which she sent to her supervisor, Jennifer Bolton, for submission to the State. Docs. 34-1 at 10-12, 23; 34-12 at 1; 34-13 at 1.

According to Bolton and Cindy Bratcher, the Director of the Lauderdale County DHR, Gilbert's job performance began to deteriorate before her transfer. Docs. 34-13 at 2; 34-14 at 1. Bolton contends that the QA and resources units have less work volume than the APS unit, and she hoped that supervising the less demanding units would help Gilbert's performance. Doc. 34-13 at 2. However, Bolton saw no improvement by Gilbert after the transfer. *Id.* For her part, Gilbert asserts that she had difficulties as QA Coordinator because she never received proper training on how to prepare the biannual report. Doc. 37 at 10. Gilbert

contends also that DHR did not require the prior QA Coordinator, Debra Newman, to supervise another unit in addition to the QA unit. Doc. 34-2 at 8.

On December 23, 2015, Gilbert received and signed a written reprimand for insubordination and for failing to perform her job properly. Doc. 34-2 at 32, 35. Among other things, the reprimand described instances in which Gilbert allegedly did not respond to calls properly as the supervisor on call, missed a meeting, and did not arrange coverage when she was out on leave. *Id.* at 32-35. The reprimand warned Gilbert that "[f]ailure to perform [her] job properly in the future may result in further disciplinary action, which may include a [s]uspension or [d]ismissal." *Id.* at 35. In connection with the reprimand, Bolton prepared a corrective action plan outlining steps Gilbert must take to improve her job performance. *Id.* at 37-39; Doc. 34-13 at 2. Gilbert received a second reprimand on November 10, 2016, based on alleged insubordination and a failure to perform her job. Doc. 34-2 at 24-27. Bolton again placed Gilbert on a corrective action plan and warned her that failure to comply or to perform her job properly could result in suspension or dismissal. *Id.* at 27-29.

During a meeting in January 2017, Bolton and Bratcher questioned Gilbert about her purported forgetfulness, and when Gilbert cited work stress as a potential cause, Bolton and Bratcher instructed Gilbert to apply for FMLA leave and provided her with the relevant paperwork. Docs. 34-1 at 58; 34-3 at 49; 34-13; 34-

14 at 2; 37 at 38. When Gilbert replied that she was not requesting leave, Bolton told Gilbert that she "could certainly find a reason to request FMLA." Docs. 34-1 at 58-59; 34-3 at 49; 37 at 14, 38. After Gilbert did not return the FMLA paperwork, and based on Gilbert's declining work performance, Bolton referred Gilbert to the employee assistance program ("EAP") for mental health treatment. Docs. 34-13 at 2; 34-3 at 50. The referral stated that Gilbert made "statements about forgetting important things related to her job," including an important meeting, and that stress may be a factor in her forgetfulness, doc. 34-3 at 50, which Gilbert did not dispute, *see* doc. 34-1 at 60.

Five days after receiving the EAP referral, Gilbert informed Bolton and Bratcher by letter that she was "working in what is clearly a hostile work environment." Doc. 34-3 at 18. Gilbert noted also that Bratcher stated that "it should only take three years to reach the level of Supervisor," and that it took Gilbert twelve years to receive such a promotion. *Id.* Finally, Gilbert stated that she intended to remain at DHR as a supervisor until her retirement. *Id.*

Thereafter, Bratcher issued a charge letter to Gilbert dated June 26, 2017, alleging Gilbert violated multiple work rules and DHR policy, including inattention to her job, failing to perform her job properly, insubordination, failing to respond while on call, failing to monitor a safety concern and violation of minimum standards for a foster home, and failing to perform her job as QA

Coordinator. Doc. 34-3 at 19-27. The letter also informed Gilbert of the date of the hearing to present the charges and evidence concerning her job performance. *Id.* at 19; doc. 34-1 at 47. In response, Gilbert described the charges as retaliatory, doc. 34-3 at 12-17, and claimed that her job duties are inflated compared to younger, Caucasian supervisors and that "upon information and belief" the allegations are "not substantiated and contain erroneous information," *id.* at 12, 15.

Approximately three weeks after DHR issued the charge letter, Gilbert requested FMLA leave based on alleged anxiety and depression due to workplace stress caused by harassment and a hostile work environment. *Id.* at 55-63. Celisa McAfee, a DHR employee in Montgomery, Alabama, reviewed Gilbert's application and denied the request based on her finding that Gilbert's condition did not "fit the criteria of a serious health condition." Doc. 34-10 at 1-2.

DHR amended the charge letter on August 1, 2017 to remove one charge against Gilbert, and postponed the hearing. Docs. 34-1 at 47; 34-3 at 28-36. Gilbert then hired an attorney to represent her, and DHR rescheduled the hearing again at her attorney's request. Docs. 34-1 at 47; 34-3 at 37-39. DHR rescheduled the hearing for a third time at the request of the hearing officer. Doc. 34-7 at 4. In the interim, DHR offered to settle the charges by demoting Gilbert and transferring her to the food stamp unit, with a decrease in pay. Docs. 34-1 at 51; 34-3 at 40. Gilbert sent a counteroffer directly to Bratcher, indicating that Gilbert would

accept the transfer if, among other things, she retained her current salary and received a guarantee that she could work until her retirement. Docs. 34-1 at 51; 34-3 at 41-42. DHR policy prevented it from accepting the counteroffer, and, together with DHR's attorney, Gilbert's attorney requested another continuance to discuss the settlement offer with Gilbert. *See* doc. 34-7 at 4. Thus, DHR rescheduled the hearing for a fourth and final time to October 12, 2017. *Id.*

The day before the hearing, Bolton texted Gilbert when Gilbert did not arrive to work as expected following a doctor's appointment. Doc. 34-1 at 54-55; 34-3 at 44-45. When Gilbert responded that she would be out that day due to high blood sugar, Bolton reminded Gilbert that the hearing was scheduled for the next day. Doc. 34-3 at 45-46. Despite the reminder, Gilbert did not attend the hearing or contact her attorney to inform him she would not be there, but Gilbert's attorney appeared and argued on her behalf. Docs. 34-1 at 53, 56; 34-5 at 3-4; 34-7 at 5. Two hours after the hearing started, Gilbert texted Bolton to report that she had overslept and just woke up. Doc. 34-3 at 47. Later that day, Gilbert was admitted to the hospital with sepsis. Docs. 34-1 at 56; 34-4 at 16-19.

Based on the evidence and arguments presented the hearing officer recommended that DHR discharge Gilbert for "fail[ing] to demonstrate that she can consistently protect children and adults in Lauderdale County," and "fail[ing] to meet deadline required for reports to the State office for monitoring the work of

Lauderdale County [DHR]." Doc. 34-4 at 14-15. Bratcher accepted the recommendation, and DHR discharged Gilbert. Docs. 34-14 at 4; 34-19. *See also* doc. 37 at 41. Although Gilbert's attorney knew that Gilbert could request a rehearing in light of her failure to appear, Gilbert did not do so, nor did she appeal to the Alabama State Personnel Board. Doc. 34-7 at 5-7. Gilbert filed instead a charge with the Equal Employment Opportunity Commission, doc. 34-17, and this lawsuit eventually.

## III. ANALYSIS

DHR argues that (1) the discrimination claims fail because Gilbert did not show its reasons for discharging her are pretextual; (2) Gilbert cannot establish a prima facie case for her retaliation claims; and (3) Gilbert did not show that DHR harassed her or that the alleged harassment was based on Gilbert's race or color as required to support a hostile work environment claim. Doc. 33. The court addresses these contentions in turn after dispensing first with Gilbert's objection to DHR's statement of undisputed facts. According to Gilbert, DHR failed to provide her with evidence related to the denial of her FMLA request and the hearing officer's findings. *See* doc. 37 at 4, 38. However, Gilbert did not point to any discovery request she served that DHR failed to respond to, and she did not raise this issue with the court previously. Moreover, DHR presented Gilbert with the hearing officer's findings at Gilbert's deposition, and attached the letter containing

the findings as an exhibit to its motion. Docs. 34-1 at 70; 34-4 at 14-15. Thus, Gilbert's objection is unavailing.

**A.    <u>Discrimination Claims</u>**

Title VII prohibits employers from discriminating on the basis of race or color, and the ADEA prohibits employers from discriminating on the basis of age. 42 U.S.C. § 2000e-2(a); 29 U.S.C. § 623(a). A plaintiff may prove her claim with either direct or circumstantial evidence. Direct evidence is "evidence that, if believed, proves the existence of a fact without inference or presumption," and it includes "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor." *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004). Gilbert contends that Bolton's comments to her that "[y]ou don't get it[;] [y]ou just don't get it[;] I don't understand why you don't get it" constitute direct evidence of discrimination. Docs. 28 at 6-8; 34-1 at 8-9. But, these comments are not such "blatant remarks" that they can prove discrimination without the need for an inference or presumption. And, Gilbert could not point to any race or age-based comments made by anyone. Doc. 34-1 at 9. Consequently, Gilbert has not provided any direct evidence of discrimination.

In the absence of direct evidence, Gilbert must rely on the burden-shifting framework established in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792

(1973), and *Texas Dep't. of Community Affairs v. Burdine,* 450 U.S. 248 (1981), to prove her case. *See, e.g., Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330-31 (11th Cir. 1998). Under that familiar framework, Gilbert bears the initial burden of establishing a prima facie case by showing she is "a qualified member of a protected class and was subjected to an adverse employment action in contrast to similarly situated employees outside [her] protected class." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010) (citation omitted). If Gilbert makes this showing, the burden shifts to DHR to produce a legitimate, non-discriminatory reason for the challenged action. *Id.* (citation omitted). And, if DHR articulates such a reason, the burden shifts back to Gilbert to prove that the proffered reason is pretext for actual, discriminatory purposes. *Id.*

1.     *Discriminatory Discharge*

DHR concedes that Gilbert can establish a prima facie case. DHR argues instead that Gilbert cannot show that its reasons for discharging her, i.e., Gilbert's history of reprimands and alleged work rules violations, are pretextual. Doc. 33 at 17-19. In particular, DHR points to the two written reprimands and the charge letter as legitimate, non-discriminatory reasons for the discharge. Doc. 33 at 18. *See also* docs. 34-2 at 24-27, 32-35; 34-3 at 19-36. Indeed, the written reprimands and charge letter outline multiple alleged work rule violations, including Gilbert's alleged failure to send caseworkers out in response to weekend calls from law

enforcement regarding children who were potentially at risk, and her alleged failure to promptly address issues arising in approved foster homes. Docs. 34-2 at 24-27, 32-25; 34-3 at 19-36. Moreover, the second reprimand states that Gilbert appears to be "repeating some of the same behaviors" addressed in the first reprimand, and DHR informed Gilbert again that "[f]ailure to perform your job properly in the future may result in further disciplinary action . . . ." Doc. 34-2 at 24, 27, 35. Because Gilbert's alleged history of work rule violations is a legitimate, non-discriminatory reason for her discharge, to survive summary judgment, Gilbert must at least raise a question of material fact regarding if DHR's proffered reason is pretextual. *See Chapman v. A1 Transport*, 229 F.3d 1012, 1024-25 (11th Cir. 2000) (en banc)

Gilbert can show pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated [DHR], or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DHR's] proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 F. App'x. 823, 825 (11th Cir. 2014) (quoting *Alvarez*, 610 F.3d at 1265). Gilbert cannot make that showing here where she signed the two written reprimands, indicating that DHR reviewed the information contained in them with her and informed her of her right to submit a written rebuttal, doc. 34-2 at 27, 35,

and the record contains no such rebuttals. Moreover, at her deposition, Gilbert could not identify any false statements in the written reprimands or charge letter. *See* doc. 34-1 at 40, 42-44, 68. And, Gilbert's affidavit does not dispute the allegations in the reprimands and charge letter, *see* doc. 37 at 37-41, and she has not produced any other evidence to dispute those allegations.[2] As a result, Gilbert has not shown that the proffered reasons for her discharge are implausible or unworthy of credence, or that DHR acted with a discriminatory purpose. Ultimately, while Gilbert may believe it was unfair to discharge her while she was ill and before she became eligible for retirement benefits, "it is not [the court's] role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266 (citation omitted). Therefore, the discriminatory discharge claims fail.

### 2. *Disparate Treatment Claims*

Gilbert also alleges that DHR denied her training it provided to Caucasian employees, denied her FMLA request, and increased her workload in comparison to Caucasian supervisors. Doc. 11 at 4-7, 9. *See also* doc. 14 at 7-8. With regard

---

[2] Without citation to any evidence, Gilbert states that she "disputes all allegations and charges presented during the [] hearing," and that she "did not have the opportunity to present a defense" at the hearing due to her illness. Doc. 37 at 21. But, Gilbert's attorney was present at the hearing, doc. 34-5 at 4, and Gilbert did not request another hearing or appeal the hearing decision to the state personnel board.

to training, Gilbert testified that she received no training on ERD reports, which she needed to complete the biannual reports, but admits that she does not know if DHR provided such training to employees outside of her protected class. Doc. 34-1 at 38-50. *See also* doc. 37. Similarly, Gilbert did not identify any employees outside her protected class for whom DHR approved FMLA leave. *See id.*; doc. 34-2 at 1-3. Thus, Gilbert cannot show that DHR treated similarly-situated employees more favorably by approving their requests for FMLA leave or providing them with training it denied her. *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019) (en banc).

Finally, Gilbert contends that DHR significantly inflated her workload in comparison to other supervisors. *See* docs. 11 at 6; 37 at 8-9, 14, 33. In particular, Gilbert identifies Debra Newman, a Caucasian woman over the age of sixty who supervised the QA unit before Gilbert, as a comparator. *See* docs. 34-2 at 8; 37 at 9.[3] According to Gilbert, DHR did not require Newman to also supervise multiple units when she held the QA Coordinator position. Docs. 34-2 at 8, 17-21; 37 at 9. Although DHR asserts that the two-unit assignment was an easier supervisory assignment than supervising other units and that the assignment resulted in less work for Gilbert, docs. 33 at 3; 34-13 at 1, DHR failed to address Gilbert's contention that Newman only supervised the QA unit as the QA Coordinator, *see*

---

[3] Gilbert did not identify any younger comparators who DHR treated more favorable with respect to workload. Thus, to the extent that Gilbert asserts a claim under the ADEA based on disparate work responsibilities, the claim fails as a matter of law.

14

doc. 33.  In addition, Newman's affidavit does not dispute that she only supervised the QA unit.  *See* doc. 34-12.  DHR also did not offer any evidence or argument that Gilbert's allegedly increased workload in comparison to Newman was not an adverse employment action or that Newman is not a similarly-situated comparator.  *See* doc. 33.  Consequently, the motion for summary judgement on Gilbert's Title VII claim premised on her contentions that DHR assigned her more work responsibilities than her white peers is due to be denied.

### B.    <u>Retaliation Claims</u>

Title VII and the ADEA prohibit employers from retaliating against an individual because she opposed any prohibited practices.  42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).  To prevail on her retaliation claims, Gilbert must first establish a prima facie case by showing "that [s]he engaged in statutorily protected activity, [s]he suffered a materially adverse action, and there was some causal relation between the two events."  *Butler v. Alabama Dep't of Transp.*, 536 F.3d 1209, 1213 (11th Cir. 2008) (quotation omitted).  To satisfy the adverse action element, Gilbert must show that "a reasonable employee would have found the challenged action materially adverse."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).  Satisfying the causation element requires Gilbert to prove that but-for DHR's desire to retaliate, she would not have suffered the adverse employment actions.  *See Booth v. Pasco Cnty.,* 757 F.3d 1198, 1207 (11th Cir.

2014) (citing *Univ. of Texas Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 363 (2013)). She can prove this through "sufficient evidence that the decision-maker became aware of the protected conduct, and that there was a close temporal proximity between this awareness and the adverse action." *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1180 n.30 (11th Cir. 2003) (citation and alteration in original omitted). "But mere temporal proximity, without more, must be very close." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

The parties agree that Gilbert engaged in statutorily protected activity when she complained to her supervisors that she was "working in what is clearly a hostile work environment;" when she alleged that the allegations in the charge letter were retaliatory and pointed out other retaliatory and harassing conduct; and when she filed an EEOC charge.[4] Docs. 34-3 at 12-19; 34-17; 37 at 5. Allegedly, DHR retaliated against Gilbert for these activities by (1) issuing her written reprimands, (2) failing to respond to her annual leave requests, (3) denying her FMLA request, and (4) terminating her employment. Doc. 11 at 3-9.[5] DHR

---

[4] The EEOC charge, which Gilbert filed after her discharge, cannot be the cause of the alleged retaliatory acts because "[a]t a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action." *Clover v. Total Sys. Serv., Inc.*, 176 F.3d 1346, 1354 (11th Cir.1999) (quotation omitted).

[5] Gilbert's Complaint also pleads that DHR retaliated against her through "unsubstantiated intimidating comments on the performance evaluation" and through "work assignments." *See* docs. 11, 37. Gilbert did not present any evidence or argument related to the allegedly retaliatory performance evaluations and has, therefore, abandoned the claim. *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[G]rounds alleged

16

contends that Gilbert cannot establish a causal connection between her protected activities and any of these alleged retaliatory actions. Doc. 34 at 22-25. The court addresses the alleged adverse actions in turn.

### 1. *Written reprimands*

The written reprimands, doc. 34-2 at 24-36, predate Gilbert's February 28, 2017 complaint to her supervisors, doc. 34-3 at 18. Thus, there is no causal relationship between her protected activity and the reprimands, *see Clover*, 176 F.3d at 1354, and, as such, Gilbert cannot show the presence of retaliatory animus.

### 2. *Failure to respond to Gilbert's vacation request*

Gilbert identified a single vacation request in June or July 2017 that she maintains DHR failed to approve. Doc. 34-1 at 72-73. Even assuming that Gilbert can show the necessary causal connection, establishing a prima facie case requires a showing that DHR's alleged failure to respond to her vacation request qualifies as an adverse employment action. In that respect, Gilbert contends she made her request for two or three days of annual leave via two separate email messages, and Bolton did not respond to either message. Doc. 34-1 at 72-73. Then, on the day

---

in the complaint but not relied upon in summary judgment are deemed abandoned."). Next, Gilbert does not specifically identify how DHR retaliated against her through work assignments, but, to the extent that Gilbert asserts that DHR retaliated against her by having her supervise both the QA and Resources units when she was the QA Coordinator, the claim fails because DHR transferred Gilbert to those positions prior to her protected activity. *See* doc. 34-13 at 1.

Gilbert also contends in her brief that DHR retaliated against her by removing her from the supervisory rotation and posting multiple notices about the administrative hearing. Doc. 37 at 11, 30-31, 33. But, Gilbert cannot amend her Complaint through her summary judgment brief. *Miccosukee Tribe of Indians of Florida v. U.S.*, 716 F.3d 535, 559 (11th Cir. 2013).

her requested leave was to begin, Gilbert sent a text informing Bolton that she would be late, and Bolton responded by stating that she thought Gilbert would be off that day. *Id.* Thus, DHR did not actually deny Gilbert's request. *Id.* at 73. Bolton asserts that it is not unusual for her to not respond immediately to a leave request sent by email or "to respond to [employees] orally that their requested leave is approved," doc. 34-13 at 3-4, and Gilbert did not dispute that statement. In addition, the record reflects that DHR approved more than twenty-five days of annual leave for Gilbert between June 26 and October 12, 2017. *See* doc. 34-1 at 74. On this record, Gilbert has not shown that DHR's failure to provide a written response to her leave request qualifies as an adverse employment action, or that retaliatory animus motivated Bolton's actions.

### 3. *Denial of FMLA leave request*

Gilbert submitted an FMLA leave request in July 2017 for anxiety and depression, which DHR denied six days after Gilbert responded to DHR's charge letter. Doc. 34-3 at 12-14, 55-63. Although the decision occurred days after Gilbert's protected activity, to establish a causal relationship, "[Gilbert] must, at a minimum, generally establish that [the person responsible for denying her request] was actually aware of the protected expression at the time [DHR] took the adverse employment action." *Raney v. Vinson Guard Serv.*, 120 F.3d 1192, 1197 (11th Cir. 1997) (citation omitted). However, McAfee, the employee who determined

that Gilbert's leave request was not based on "an eligible event" and did "not fit the criteria of a serious health condition," docs. 34-4 at 2; 34-10 at 2; 34-18, attests that she did not have knowledge of any disciplinary actions related to Gilbert when she made the determination, doc. 34-10 at 2. Gilbert did not present any evidence to cast doubt on McAfee's statement, and there is no evidence that McAfee knew of Gilbert's protected activity when she denied the FMLA request.[6] As a result, Gilbert has failed to show that her protected activity was a but for cause of the denial of her request for FMLA leave.

### 4. *Charge letters and discharge*

The final retaliation claim is related to the charge letters and discharge. DHR issued the initial charge letter on June 26, 2017, informing Gilbert of an administrative hearing related, in part, to her job performance and alleged violations of work rules. Doc. 34-3 at 19-27. DHR issued this letter more than three months after Gilbert's first protected activity. Thus, Gilbert cannot rely on temporal proximity alone to prove causation, *see Thomas*, 506 F.3d at 1364; *Clover*, 176 F.3d at 1354, and there is no other evidence to suggest a causal connection between her protected activity and the charge letter.

Gilbert engaged in her second protected activity when she responded to the charge letter. Thereafter, DHR issued an amended charge letter, removing one

---

[6] Gilbert states in her brief, without any evidentiary proof, that she has "witnesses that [DHR's] human resource department said they knew about retaliation." Doc. 37 at 32.

charge contained in the initial letter, and eventually held a hearing.[7]  Docs. 34-3 at 28-36, 34-5.  Then, based on the recommendation of the hearing officer, DHR discharged Gilbert.  Docs. 34-4 at 14-15; 34-19.  Although these actions occurred within three months of Gilbert's second protected activity, an employer's decision to "proceed[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  *Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam).  Thus, because DHR began the process of discharging Gilbert more than three months after Gilbert engaged in her first protected activity, Gilbert cannot show a causal connection based on the temporal proximity between her response to the charge letter and the adverse events that ensued.  Therefore, in the absence of any other evidence to support an inference of causation, *see* doc. 37, Gilbert has failed to show that retaliatory animus motivated her discharge.[8]

---

[7] Gilbert asserts that the hearing was retaliatory because DHR did not reschedule it to accommodate her illness. Doc. 37 at 41.  However, neither DHR nor Gilbert's attorney knew why she did not attend the hearing, docs. 34-7 at 5; 34-13 at 4, and more than two hours after the hearing began, Gilbert informed Bolton that she had overslept and had just woken up, doc. 34-3 at 47.

[8] Gilbert contends that the job performance issues and work rule violations are pretext for retaliation because the DHR employees who confirmed the issues are the same two individuals she complained to about a hostile work environment.  Doc. 37 at 31.  Gilbert's contention is unavailing because the record reveals that an independent hearing officer found that the evidence supported the conclusion that Gilbert violated certain work rules and recommended Gilbert's termination.  *See* doc. 34-4 at 14-15.  In addition, the hearing officer did not rely only on the testimony of the two individuals in question in making her determination.  *See* docs. 34-5; 34-6.

To summarize, Gilbert has not established a prima facie case with respect to any of the alleged retaliatory acts. As a result, Gilbert's retaliation claims fail.

### C. Hostile Work Environment Claim

To establish a hostile work environment claim under Title VII, Gilbert must prove, in part, that DHR subjected her to unwelcome harassment, the harassment was based on her protected status, and that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). Additionally, it is a "bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012) (quotation omitted). Rather, "only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis." *Id.*

Here, Gilbert alleges that DHR subjected her to a hostile work environment by (1) verbally degrading her in front of her Caucasian subordinates, (2) denying her training opportunities, (3) instructing her to apply for FMLA leave, (4) giving her a referral for mental health treatment, (5) denying a subsequent request for FMLA leave, (6) moving her office to physically isolate her, (7) repeatedly rescheduling an administrative hearing regarding her job performance, and

(8) placing multiple notices about the hearing on a conference room door. Doc. 11 at 3-4, 6-9. DHR argues that Gilbert's claim fails because she did not create a question of fact regarding whether any of these alleged actions qualify as harassment, or if the alleged actions were based on race. Doc. 33 at 25-39. Indeed, for the first four alleged incidents, Gilbert admits that she did not hear Bolton or Bratcher make any race-based comments, *see* doc. 34-1 at 8-9, and Gilbert has not provided any evidence that their conduct was racially motivated. Thus, while Bolton's and Bratcher's conduct may have been insensitive or overbearing, there is no evidence to support a conclusion that it was based on Gilbert's race or color, and the court cannot consider this conduct in its analysis of Gilbert's hostile work environment claim.

Similarly, Gilbert has not shown that the denial of her FMLA request, the purported physical isolation of her office, the rescheduling of her administrative hearing, and the notices posted about the hearing were based on Gilbert's race or color. To begin, Gilbert could not identify any employees DHR treated differently with respect to FMLA requests, and she did not dispute DHR's evidence that the individual who made the decision to deny her FMLA leave did not know Gilbert's race at the time she made the decision. *See* doc. 34-10 at 1. And, as for the office isolation, Gilbert testified that she felt her office was isolated after contractors installed a temporary wall as part of a refurbishment of the entire building, and that

she does not believe DHR intended to isolate her.  *See* docs. 34-1 at 70-71; 34-2 at 3.  Next, although DHR rescheduled Gilbert's administrative hearing four times, including once at the request of Gilbert's attorney, doc. 34-7 at 3, Gilbert did not offer any evidence to suggest that her race or color played any role in the continuances.  In fact, Gilbert admitted that DHR's reasons for rescheduling her hearing were not related to a harassing purpose.  Doc. 34-1 at 72.  Relatedly, Gilbert also did not present evidence that DHR posted signs on a conference room door stating "reserved for hearing" or "reserved for administrative hearing" to harass her on the basis of her race or color.  *See* doc. 34-2 at 11.  Therefore, because Gilbert has failed to show that her race or color motivated any of the alleged harassing conduct, her hostile work environment claim fails also.

## IV.   CONCLUSION AND ORDER

DHR's motion for summary judgment, doc. 32, is **DENIED** solely as to Gilbert Title VII discrimination claim based on disparate treatment with respect to Gilbert's workload.  In all other respects, the motion is **GRANTED**.  Accordingly, (1) the Title VII and ADEA discrimination claims based on discriminatory discharge and disparate treatment with respect to training opportunities and FMLA leave, (2) the ADEA discrimination claim based on Gilbert's disparate workload, (3) the Title VII and ADEA retaliation claims, and (4) the Title VII hostile work environment claims are **DISMISSED WITH PREJUDICE**.

**DONE** the 25th day of July, 2019.

ABDUL K. KALLON
UNITED STATES DISTRICT JUDGE